*1020 OPINION.
McMahon :
The petitioner alleged in his petition that the Commissioner erred in including in gross income for the year 1924 any part of the Liberty bonds and accumulated interest amounting to $88,218.25 received by the petitioner during that taxable year in trust for Hooven Realties, Inc. However, there was no evidence whatsoever on this point and in his brief petitioner stated that this contention had been abandoned. We shall therefore disregard this assignment of error.
The first question to be decided is whether any part of the profit from the sale of petitioner’s business under the contract of January *1021 8, 1920, constituted income to the petitioner in the years in controversy. The contract in question provided for the sale of all of petitioner’s businesses, including good will, clientele, etc., to the vendee corporation for a cash payment of $67,683.89, and $300,000 par value of Liberty bonds, which were to be deposited in escrow. The petitioner agreed to refrain from competing in business for five years and also that none of his companies would engage in a similar business. By the terms of the agreement the escrow depositary was to release to the petitioner on January 10 of each of the years 1921 to 1924, inclusive, $75,000 par value of these Liberty bonds with interest coupons attached, conditioned upon the filing by the petitioner of an affidavit setting forth, among other things, that neither he nor Otto Braunwarth, Inc., had engaged in the retail tire or tube business. Of each $75,000 par value Liberty bonds, $15,000 par value represented salary and the remaining $60,000 par value represented the purchase price of the property. The contract provided that in case neither the petitioner nor his legal representative filed the affidavit within the time as specified or as extended by the depositary, the depositary was to redeliver to the vendee an amount of said bonds equal to the amount which it would have delivered to petitioner and all rights of petitioner in and to such bonds should terminate.
The petitioner complied with the terms of the contract and received the amounts of $72,093.12 .and $74,085 in the years 1922 and 1923, respectively, from the sale by the depositary of the Liberty bonds due him in each of those years. In 1924 he received the final installment of Liberty bonds, which had a fair market value at the time received of $74,109.38. The respondent has included these amounts in petitioner’s income for the respective years.
At the hearing the attorney for the petitioner, in speaking of the $15,000 which was indicated in the contract as compensation for services rendered, said:
With respect to that there is not any issue between us; the taxpayer concedes it was taxable as taxed by the Government.
The respondent’s inclusion of such amount in petitioner’s income for each year before us will therefore be approved.
There still remains for determination the question whether the remainder of the principal amount received in Liberty bonds or the proceeds from the sale thereof were properly includable in petitioner’s income in the years in which actually received by petitioner.
Although the year 1920 is not- before us, in order to determine the correct method of computing income for 1922, 1923, and 1924, it is necessary to decide whether the transaction was a closed one in that year. There is no evidence as to the accounting basis upon which the petitioner operated, so it must be assumed that he was on the cash *1022 receipts and disbursements basis. The petitioner contends that the transaction was closed in 1920, and that any profit realized was realized in that year and is not taxable in the following years. We are not advised as to how the petitioner treated the transaction in his tax return for 1920.
In K. E. Merren, 18 B. T. A. 156, property was sold by the petitioner in 1920 for cash and stock. The stock was then in escrow and could not be released until 1921. A receipt was given to the petitioner entitling him to the stock, but he did not receive it until 1921. We held that the petitioner, on a cash receipts and disbursements basis, did not receive taxable income from the stock until it was released. It seems to us that the situation in the instant proceeding is similar to that in the Merren case. The Liberty bonds held in escrow were not available to the petitioner until the required time had elapsed in each instance, and then only if petitioner had refrained from competing in business and had filed an affidavit to that effect.
It is clear that title to the property passed to the vendee in 1920 and that the vendee took possession of the property in that year. It is clear that the transaction was closed in that year. It does not necessarily follow, however, that the entire profit is taxable in that year. If property is sold for cash the entire profit, of course, is taxable in the year of sale. If property is sold for cash and deferred payments, the entire profit is taxable in the year of sale if the deferred payments have a readily realizable market value or are the equivalent of cash. Clara Brunton, Executrix, 15 B. T. A. 348; affirmed in Brunton v. Commissioner, 42 Fed. (2d) 81; certio-rari denied by the United States Supreme Court on December 1, 1930. But if the deferred payments do not have a readily realizable market value, the vendor is entitled to first recover his capital investment before any profit arises and any payments in excess of such capital investment constitute income in toto in the years received. See Leroy G. Evans, 5 B. T. A. 806; D. M. Stevenson, 9 B. T. A. 552; Mainard E. Crosby, 14 B. T. A. 980; and Charles C. Ruprecht, 16 B. T. A. 919; affirmed in Ruprecht v. Commissioner, 39 Fed. (2d) 458. See Moore v. Commissioner, - Fed. (2d) - (C. C. A., 10th Cir., March 14, 1931).
The petitioner has offered no evidence to establish the readily realizable market value of his contract right to receive the Liberty bonds, if it in fact did have a readily realizable market value. Such being the case, the entire selling price was not taxable income to petitioner in 1920. The amounts received in each of the years in controversy were income to the petitioner in those years to the extent that they exceeded the capital investment of the petitioner in the business sold.
*1023 The petitioner testified that the value of the tangible assets sold to Dunlop America, Ltd., exclusive of the accounts receivable, was slightly in excess of $7,000. It is his contention that under the contract the sum of $7,683.39 was in payment of the tangible assets of the business and that the remainder of the purchase price was for the good will. He, therefore, contends that if the entire profit was not taxable in the year 1920, he is entitled to recover the March 1, 1913, value of the good will before any part of the amounts received in the years in controversy constitute taxable income to him, since, he claims the good will sold in 1920 was the same good will which he purchased in 1905 and developed thereafter. The petitioner’s argument is based upon several erroneous assumptions of fact. The contract does not attempt to allocate the total purchase price as between the tangibles and intangibles of the business and we can not say what part of the purchase price was attributable to either class of assets. Furthermore the good will sold in 1920 was not the good will purchased in 1905. That which was sold in 1920 was primarily the business of the Dunlop Tire Sales Company, which was the successor to Otto Braunwarth, Inc. The latter company was organized in July, 1913, and there is no satisfactory evidence that it acquired the assets and business of any preceding business. There were at least six businesses or corporations in which the petitioner was interested from 1905 to 1920. Some of these succeeded to the assets and business of their predecessors and some did not. For instance, the petitioner sold out his interest in the Broadway Auto Accessories Company to Whittemore for cash and then formed a new corporation. In July, 1913, petitioner disposed of his interest in the Russian Tire Sales Company to Page for an undisclosed consideration and then formed Otto Braunwarth, Inc., which corporation was entirely unrelated to the former company. The business sold in 1920 was that of the Dunlop Tire Sales Company which acquired all the assets of Otto Braunwarth, Inc. It may be conceded that the petitioner had built up a considerable clientele and business acquaintanceship and that this clientele followed him, to a large extent, during his various business enterprises. But this personal following does not constitute good will within the generally accepted meaning of the term. Good will is defined in Pfleghar Hardware Specialty Co., 11.B. T. A. 361, as follows:
Good will may be defined to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the'general public patronage and encouragement which it receives from constant or habitual customers on account of its local position or common celebrity, or reputation for skill, affluence, punctuality, or from other ancient partialities or prejudices.
*1024 In Providence Mill Supply Co., 2 B. T. A. 791, we said:
* * * We find no basis for including in invested capital good will in any amount. There is no evidence that the taxpayer acquired any good will in a legal sense. Neither of these corporations acquired any established business or property. The stock was issued for cash (although at considerably less than par) to the men who formed the corporation, and they transferred no other property to the corporation. The only benefit received by the taxpayer bearing any resemblance to good will was Murphy’s services. He had had a long experience and acquaintanceship in selling the articles the taxpayer was engaged in marketing. But he did not have an established business or any assets of a business which were transferred to the taxpayer; he had been employed by others. All this corporation got was his services. Ability, skill, experience, acquaintanceship, or other personal characteristics or qualifications do not constitute good will as an item of property; nor do they exist in such form that they could be the subject of transfer.
See also Northwestern Steel & Iron Corporation, 6 B. T. A. 119, and Kendrick Coal & Dock Co., 6 B. T. A. 1092.
Since the business sold in 1920 did not come into existence until July, 1913, the basis for determining gain or loss is its cost. Petitioner has failed to establish the cost of the business sold in 1920 and the respondent’s action in including in income the total amounts received under the contract in each of the years in controversy is approved.
Another alternative contention advanced by petitioner is that if the entire profit was not taxable in 1920, the petitioner is entitled to have such profit computed under the provisions of section 206 of the Revenue Act of 1921 and section 208 of the Revenue Act of 1924. Those sections provide in part:
(a) That for the purpose of this title:
(1) The term “capital gain” means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921.
However, the sale in question was consummated, within the meaning of the revenue acts, prior to December 31, 1921, and the capital gain sections do not apply. See J. W. McWilliams, 15 B. T. A. 329.
The only remaining question to be decided is whether the respondent erred in taxing at surtax rates certain amounts representing interest received by the petitioner from the Liberty bonds. The petitioner, during the years in question, did not own any United States bonds other than those he received under the contract of January 8,1920.
Section 7 -of the Second Liberty Bond Act, 40 Stat. 291, Sept. 24, 1917, is as follows:
That none of the bonds authorized by section one, nor of the certificates authorized by section five, or by section six, of this Act, shall bear the circulation privilege. All such bonds and certificates shall be exempt, both as to *1025 principal and interest from all taxation now or hereafter imposed by the United States, any State, or any of the possessions of the United States, or by any local taxing authority, except (a) estate or inheritance taxes, and (b) graduated additional income taxes, commonly known as surtaxes, and excess profits and war-profits taxes, now or hereafter imposed by the United States, upon the income or profits of individuals, partnerships, associations, or corporations. The interest on an amount of such bonds and certificates the principal of which does not exceed in the aggregate $5,000, owned by any individual, partnership, association, or corporation, shall be exempt from the taxes provided for in subdivision (b) of this section.
The Fourth Liberty Bond Act, 40 Stat. 844, July 9, 1918, amended the Second Liberty Bond Act, but section 7 remained unchanged.
Section 1328 of the Revenue Act of 1921 which was reenacted in the Revenue Act of 1924 as section 1028, provides:
That the various Acts authorizing the issues of Liberty bonds are amended and supplemented as follows:
(a) On and after January 1, 192Í, 4 per centum and 4% per centum Liberty bonds shall be exempt from graduated additional income taxes, commonly known as surtaxes, and excess-profits and war-profits taxes, now or hereafter imposed by the United States upon the income or profits of individuals, partnerships, corporations, or associations, in respect to the interest on aggregate principal amounts thereof as follows:
Until the expiration of two years after the date of the termination of the war between the United States and the German Government, as fixed by proclamation of the President, on $125,000 aggregate principal amount; and for three years more on $50,000 aggregate principal amount.
(b) The exemptions provided in subdivision (a) shall be in addition to the exemptions provided in section 7 of the Second Liberty Bond Act, and in addition to the exemption provided in subdivision (3) or section 1, of the Supplement to the Second Liberty Bond Act in respect to bonds issued upon conversion of Sy2 per centum bonds, but shall bo in lieu of the exemptions provided and free from the conditions and limitations imposed in subdivisions (1) and (2) of section 1 of the Supplement to Second Liberty Bond Act and in section 2 of the Victory Liberty Loan Act.
We have already held that the petitioner did not own the Liberty bonds until they were actually received by him. In 1921 the petitioner became entitled to $15,000 par value of Liberty bonds and the evidence does not establish that he ever sold them. Since the respondent, in the deficiency letter, apparently held that petitioner still owned, in 1922, 1923, and 1924, the bonds received in 1921, and there is no evidence to the contrary, we must conclude that such was the case. Therefore, it is clear that in 1922, when he received the second installment of $75,000 par value Liberty bonds, he owned $150,000 par value Liberty bonds. The interest on $130,000 of this amount was tax exempt and petitioner is liable for surtax only upon the interest upon the remaining $20,000 par value. The respondent has taxed the entire amount of $6,375, accrued interest received in 1922 upon the $75,000 par value bonds received in that year. We *1026 have no evidence as to whether the petitioner paid a tax in 1922 upon the interest received from the $75,000 par value of Liberty bonds which were received in 1921, and we must therefore conclude that no tax was paid upon the interest received from those Liberty bonds. Even so, the petitioner is taxable only upon the interest from $20,000 par value of the Liberty bonds which he owned in 1922. It follows that only four-fifteenths of the amount of interest received in 1922 from the Liberty bonds received by petitioner in that year is taxable at surtax rates. Adjustment will be made accordingly under Eule 50.
In 1923, the petitioner, having sold the $75,000 par value Liberty bonds received in 1922, still owned the same aggregate par value of Liberty bonds, i. e., $150,000, since he received in 1923 an additional $75,000 par value. These bonds were sold on or about January 10, 1923, the same time that the accrued interest thereon in the amount of $9,562.50 was received by petitioner. The period provided in section 1328, Act of 1921, during which the interest upon $130,000 par value Liberty bonds was exempt from surtax, expired on July 2, 1923, the formal proclamation terminating the war with Germany having been issued on July 2, 1921 — 42 Stat. 105. The interest here involved was that which accrued upon the Liberty bonds during a period prior to January 10, 1923. Therefore the petitioner is entitled to the benefit of the higher exemption. Thus, in 1923, as in 1922, we are faced with a lack of evidence as to whether petitioner paid any tax upon the interest received from the $75,000 par value of Liberty bonds acquired in 1921. It appears that the respondent taxed only $7,225 of the total of $9,562.50 interest received upon the 1923 installment of Liberty bonds. However, as was the case as to the interest received in 1922, only four-fifteenths of the amount received in 1923 is taxable at surtax rates. Adjustment will be made accordingly.
In 1924, when petitioner received the installment of $75,000 par value bonds, he still owned $150,000 par value, so far as we are able to determine from the record, having sold those received in 1923. During this year the exemption from surtax applied only to interest received upon a maximum of $55,000 par value Liberty bonds. The amount of interest which petitioner received in that year upon the Liberty bonds to which he was entitled in that year, was $12,750, of which the respondent held that $7,225 «was subject to surtaxes. There is no evidence that the petitioner paid the tax upon the interest received from the Liberty bonds retained since 1921. Thus, so far as the record shows, the respondent has taxed the interest upon less than $75,000 par value Liberty bonds, whereas petitioner was apparently liable for tax upon interest from $95,000 par value. We find that the respondent has not overtaxed the petitioner in this *1027 regard for the year 1924 and, accordingly, we approve his determination.
Reviewed by the Board.

Judgment will be entered under Rule 50.

GoodRich, Matthews, and Steknhagen dissent.